**So Ordered.**

**Dated: August 13th, 2020**



_Frederick P. Corbit_

**Frederick P. Corbit**
**Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF WASHINGTON

In re:

SAJID A. RAVASIA and DEBRA J.
RAVASIA,

              Debtors.

GREGORY M. GARVIN, Acting
United States Trustee,

              Plaintiff,

v.

SAJID A. RAVASIA and DEBRA J.
RAVASIA,

              Defendants.

Case No. 17-00106-FPC

Adversary No. 17-80021-FPC

**FINDINGS OF FACT,
CONCLUSION OF LAW, AND
ORDER DENYING CHAPTER 7
DISCHARGE**

## I.  SUMMARY

The United States Trustee requests that this court deny husband and wife

Debtors Sajid and Debra Ravasia a Chapter 7 discharge of their debts. At trial, the

United States Trustee argued that the Ravasias, both medical doctors, made multiple

FINDINGS OF FACT, CONCLUSIONS OF LAW & ORDER - 1

material misrepresentations about their financial situation in order to mislead

creditors, the Chapter 7 Trustee, and the United States Trustee. In particular, the

United States Trustee argued that the Ravasias intentionally misrepresented in their

bankruptcy schedules their combined gross income as $26,818.05 per month, even

though the doctors' combined average gross income in 2016—the year before they

filed bankruptcy—was approximately $43,659[1] per month, and in 2017—the year in

which they filed bankruptcy—their income was approximately $54,015 per month.[2]

   Moreover, the United States Trustee argued that the Ravasias'

misrepresentations were material because, if the Ravasias had provided accurate

financial information, interested parties would have petitioned this court to convert

the Ravasias' Chapter 7 case to Chapter 11 where, before receiving a discharge of

their debts, the Ravasias would have had to propose a plan of reorganization to pay

at least a portion of what they owed their creditors.

   The United States Trustee has proven its case. Therefore, since "[t]he

principal purpose of the Bankruptcy Code is to grant a 'fresh start' to the 'honest but

---

[1] The Ravasias' 2016 joint tax return, Form 1040 at line 7, indicates annual "wages, salaries, tips, etc." of $523,913 (Ex. 12). The monthly average is $43,659.42.

[2] The Ravasias' 2017 joint tax return, Form 1040 at line 7, indicates annual "wages, salaries, tips, etc." of $648,181 (Ex. 13). The monthly average is $54,015.08.

17-80021-FPC   Doc 177   Filed 08/13/20   Entered 08/13/20 14:58:48   Pg 2 of 27

unfortunate debtor,"[3] rather than to people who "knowingly and fraudulently ... in connection with ... [their bankruptcy] case [make] a false oath or account,"[4] the Ravasias' Chapter 7 discharge of debts is denied.

## II.  INTRODUCTION

This adversary case was based on the Amended Complaint filed August 27, 2019, by the United States Trustee against Debtors Sajid A. Ravasia and Debra J. Ravasia. (Adversary Case No. 17-80021, ECF No. 115). The trial took place on July 15, 16, and 17, 2020. The Court considered the live testimony of Chapter 7 Trustee John Munding, Brian Moran, Sajid Ravasia, Debra Ravasia, and John Omlin, CPA; the depositions of Edward TrueLove and Peter Sommerville; the admitted exhibits; and the closing arguments of counsel on July 29, 2020. Based on the foregoing, the Court enters the following findings of fact, conclusions of law, and order:

## III.  FINDINGS OF FACT[5]

1.       Debtor Sajid Ravasia is a psychiatrist, and co-debtor Debra Ravasia is an obstetrician/gynecologist.

---

[3] *Marrama v. Citizens Bank of Massachusetts*, 549 U.S. 365, 367 (2007)(*quoting Grogan v. Garner*, 498 U.S. 279, 286 (1991)).

[4] 11 U.S.C. § 727(a)(4)(A).

[5] Where a finding of fact is actually a conclusion of law, it shall be treated as such and vice versa.

2.     The Ravasias filed a petition for Chapter 7 bankruptcy relief on January 19, 2017. (ECF No. 1). Sajid Ravasia testified that in the bankruptcy petition schedules and statement of financial affairs, he is alternatively referred to as "Debtor," and "Debtor 1," and Debra Ravasia is alternatively referred to as "Co-Debtor" and "Debtor 2."[6]

3.     On June 5, 2017, John D. Munding, the Chapter 7 Trustee, filed a timely Complaint Objecting to Discharge under 11 U.S.C. §727(a). (Adversary Case No. 17-80021, ECF 1).

4.     After the Chapter 7 Trustee settled certain issues with the Debtors, the United States Trustee was substituted as the Plaintiff in the adversary case. (Adversary Case No. 17-80021, ECF 20). On August 27, 2019, the United States Trustee filed United States Trustee's Amended Complaint Objecting to Discharge, pursuant to 11 U.S.C. Sections 727(a)(2) and (a)(4). (Adversary Case No. 17-80021, ECF 115).

5.     The Amended Complaint alleges that the Debtors made multiple material misrepresentations about their financial situation in order to mislead the court and creditors about their ability to repay their debts.

---

[6] Because each debtor is a doctor, references to the Ravasias will forgo the honorific and instead use the particular debtor's first name for the sake of clarity. No disrespect is intended.

6.      In the Amended Complaint, the United States Trustee alleged that the Debtors provided false oaths related to: (1) each Debtor's income; (2) Debtors' estimate of post-petition monthly expenses; (3) Debtors' estimate of unsecured debt; and (4) the Debtors' conduct surrounding a ski condominium they sold to Debra Ravasia's father.

7.      At trial, the Debtors did not object to the introduction of evidence related to their representations about an anticipated 2016 tax refund on their Schedules and in the 341 Meeting of Creditors.

8.      At the conclusion of the trial, citing Rule 7015(b)(2), the United States Trustee moved to modify the pleadings to conform to the evidence presented at trial. (Adversary Case No. 18-80021, ECF No. 171). Specifically, the United States Trustee requested the Complaint be amended to include a fifth category of false oath on the Schedules related to Debtor's alleged misrepresentations about their anticipated 2016 income tax refund.

9.      Debra Ravasia objected[7] to the amendment but acknowledged that the issue of whether the Debtors made a false oath related to the 2016 anticipated tax refund was litigated at trial. (Adversary Case No. 17-80021, ECF No. 172).

---

[7] At trial, the debtors were represented by separate counsel.

17-80021-FPC     Doc 177     Filed 08/13/20     Entered 08/13/20 14:58:48     Pg 5 of 27

**INCOME – SAJID RAVASIA**

10.     Debtors seeking Chapter 7 protection must complete "Schedule I: Your Income." On this form, part 2, the instructions state:

> Estimate monthly income as of the date you file this form… List the monthly gross wages, salary and commissions (before all payroll deductions). If not paid monthly, calculate what the monthly wage would be.

Debtors listed monthly gross wages for Sajid Ravasia as $26,818.05 and monthly gross wages for Debra Ravasia as $0. After Sajid Ravasia's payroll deductions, Debtors listed a net monthly income of $11,487.09. (ECF No. 1-3 at pp. 41-42).

11.     Part 2 of Schedule I, line 3 provides a line for debtors to "estimate and list monthly overtime pay." The Ravasias entered $0 for Sajid Ravasia. Similarly, Part 2, line 8h provides a line for "other monthly income." The Ravasias entered $0 for Sajid Ravasia. (ECF No. 1-3 at pp. 41-42).

12.     Prior to filing for bankruptcy, Debra Ravasia was the principal of both Northwest Health Summit and Ajuva Spa. The businesses of Northwest Health Summit and Ajuva Spa failed in 2016 and caused Sajid and Debra Ravasia to personally file for bankruptcy. Additionally, for Debra Ravasia to be gainfully employed as a doctor after the business failures, she had to travel outside of the United States to gain recent experience delivering babies so that she could work as an obstetrician/gynecologist in the United States and Canada.

FINDINGS OF FACT, CONCLUSIONS OF LAW & ORDER - 6

13.     In response to Schedule I, question 13, that states "[d]o you expect an increase or decrease [in income] within the year after you file this form," Debtors checked the "yes" box, and explained simply: "Co-debtor [Debra Ravasia] is looking for work." (ECF No. 1-3 at p.42). The Debtors provided no explanation that Sajid Ravasia's income would increase and exceed the $26,818.05 per month figure provided in response to Question 2.

14.     On May 28, 2019, more than eighteen months after the adversary action was commenced, Debtors amended Schedules I and J.  (ECF 179). On the Amended Schedules, the Debtors represented Sajid Ravasia's gross monthly wage as $20,630.40, even less than originally reported. After deductions, the Ravasias represented Sajid's net monthly income as $10,285.56. The Amended Schedules represented Debra Ravasia's income was still $0, omitting her significant earnings from 2017. (ECF 179, pp. 2-3).

15.     In the Amended Schedules, the Debtors reported monthly business losses of $23,588.17, and thus had a net negative monthly income of -$13,302.62.

16.     Amended Schedule I included an Attachment entitled "Attachment 1 – Explanation of [Sajid Ravasia's] Compensation at the Time of Filing and Expectations Going forward at the Time of Filing," that stated:

> With [Debra Ravasia] about to leave the country for an undefined amount of time, possibly many months, [Sajid Ravasia] was about to become a solo parent. As such, [Sajid Ravasia] could no longer count on having time available to do extra shifts or make

extra RVU income, even if those continued to be an option at Providence. [Sajid Ravasia] was expecting to make what an average psychiatrist in this area of the country makes (i.e., the base salary for full time work - $250,000) but was not at all sure he would have time available to continue to work more than that. Benchmarks for what the average full-time psychiatrist is paid nationally and in Western Washington are shown in Appendix 2 and are in line with Providence's salary of $250,000 for full time work. Any other income is simply a bonus, and at the time of filing [Sajid Ravasia] was not expecting to be able to work any more than a regular full-time workload at a regular full-time salary.

(ECF No. 179 at p.4).

17. Sajid Ravasia testified that he has worked at Providence for approximately 15 years and that he completed Schedule I related to his income. He said he understood that he was supposed to estimate his monthly income on the date he filed for bankruptcy, in other words, for the month of January, 2017.

18. Sajid Ravasia also testified that for several years, Providence had a severe shortage of psychiatric doctors, so a significant portion of his income was earned seeing patients who should have been assigned to other doctors. Also, he testified that Providence planned to hire additional psychiatrists whose presence would eliminate Sajid's extra shift pay and thus reduce his income. Sajid testified that, at the time of the Ravasias' petition, he anticipated that in 2017 he would receive nothing more than his base salary of $250,000.

FINDINGS OF FACT, CONCLUSIONS OF LAW & ORDER - 8

19.     Sajid Ravasia testified that he did not know how much his bonus would be, and he did not know if there was place to provide bonus information on Schedule I. He acknowledged that while in the short term he expected Debra Ravasia would be in Afghanistan with a non-profit that paid a minimal stipend, he did not expect that she would be volunteering forever.

20.     Sajid Ravasia also testified that he took two weeks off work in December 2016 and January 2017. (Ex. 6, p. 24). He admitted his income in the first two weeks January, 2017 was lower than his income in every other month in 2017. He explained that his income increased later in 2017 because by March or April of 2017 he took on additional adolescent cases, and in August, his employer lost two psychiatrists, thus leaving the department understaffed.

21.     Sajid Ravasia provided several months' worth of 2016 pay stubs to the Chapter 7 Trustee shortly after the bankruptcy petition was filed. The pay stubs covered the period from April 30 through October 15, 2016. (Ex. 8). Brian Moran, a financial analyst in the United States Trustee's office, examined Sajid Ravasia's pay stubs and testified at trial that the paystubs revealed an average gross income of $47,359.02 per month.  (Ex. 9, p.1).

22. Sajid Ravasia's W-2 wage and tax statements for 2013 through 2016 reveal Sajid Ravasia's gross annual wages[8] as follows:

- 2013: $575,641
- 2014: $569,946
- 2015: $530,503.99
- 2016: $481,268.00

(Ex. 147).

23. Sajid Ravasia's 2017[9] W-2 wage and tax statement indicates his gross annual wages were $668,123. (Ex. 11).

24. On April 26, 2019, the Debtors testified at a second 341 Meeting of Creditors. In the hearing, the United States Trustee pointed out that Sajid Ravasia's 2016 W-2 revealed he grossed $480,000 per year, which averages $40,000 per month. (Ex. 27, p. 67). The United States Trustee asked why the Ravasias estimated Sajid's gross income at $27,000 per month on Schedule I. Both Ravasias testified

---

[8] The wages stated are from the W-2 Box 5, wages subject to Medicare taxes.

[9] On July 14, 2020, Debtor Debra Ravasia filed a Motion in Limine seeking to exclude non-party witnesses from the courtroom during other witness' testimony and to exclude reference to debtors' post-petition income because it was irrelevant. (Adv. Case no. 17-80021, ECF 160). The court granted the motion to exclude witnesses and took under advisement the motion to exclude evidence of Debtors' 2017 income. During the trial, the motion to exclude evidence of Debtors' 2017 income became moot when Debra and Sajid Ravasia presented evidence of their 2017 income.

FINDINGS OF FACT, CONCLUSIONS OF LAW & ORDER - 10

that it appeared that the calculation used only Sajid Ravasia's annual base salary of $250,000 and the calculation did not include his "bonuses." (Ex. 27, p. 68). The Ravasias said they relied upon their lawyer to complete the schedules, but the Ravasias also acknowledged that they reviewed the schedules before they signed them. (Ex. 27, p. 69).

25.     At the same Section 341 Meeting of Creditors, Sajid Ravasia acknowledged that his income was more in 2017 than in 2016, and he explained that his income has "been on a steady slope upwards for the last two to three years" because Providence was unable to retain psychiatrists. (Ex 27, pp.70-71). Sajid Ravasia characterized Providence's plan to have its psychiatric department fully staffed in 2017 "a fantasy." *Id.*

26.     Sajid Ravasia also testified at the Section 341 Meeting of Creditors that the Ravasias realized around the third week of July, 2017, when he received his bonus, that his income significantly exceeded the amount reported on Schedule I. (Ex. 27, p. 76). Sajid Ravasia said that he believed they informed his lawyer about his increased income, and Debra Ravasia testified that she understood the Debtors had no "ongoing reporting requirement." (Ex. 27, pp. 76-77).

27.     The Debtors' Schedule I, that was filed on January 19, 2017, and the Amended Schedule I filed May 28, 2019, both indicated Sajid Ravasia's income was substantially less than the income he earned in each of the several years before he

filed and after he filed bankruptcy. Also, the Debtors failed to indicate on the original or the Amended Schedule I, line 13 that Sajid Ravasia's income could increase (and in fact, had increased substantially) within the year of filing the form. These repeated misrepresentations and omissions of Sajid's income were materially false.

28. John Munding, the Chapter 7 Trustee who initially filed the adversary lawsuit against the Debtors testified that if the Debtors had not misrepresented their income, he would have handled the case differently.

29. The fact that Sajid Ravasia's income on Schedule I was substantially under-reported should have been, and in fact admittedly was, evident to the Ravasias, and thus the Debtors' false oath related to Sajid Ravasia's income was made knowingly, deliberately and consciously.

30. The United States Trustee established by a preponderance of the evidence that the Debtors failed to update their schedules with accurate income information for Sajid Ravasia. Instead, the Amended Schedules continued to reflect a dramatic under-reporting of Sajid's income. The Debtors acted with intent to deceive interested parties about the income earned by Sajid Ravasia.

## INCOME – DEBRA RAVASIA

31. Prior to the business failures of Northwest Health Summit and Ajuva Spa, Debra Ravasia earned substantial income. However, at trial, Debra Ravasia

testified that at the time she and her husband petitioned for bankruptcy, she was "not terribly employable." She had no realistic job prospects in December 2016, and she was not working in January 2017. She testified that throughout much of 2017, she was looking for work and filling in for various physicians on leave, and that this work was unsteady and not assured.

32.     The evidence reveals Debra Ravasia had significant income beginning as early as May, 2017. At trial, Debra Ravasia acknowledged her gross wages in 2017 per month were:

- January $0
- February $332
- March $1,394
- April $574
- May $9,690
- June $9,430
- July $23,413
- August $55,886
- September $41,607
- October $54,103
- November $41,527
- December $22,506.

(Ex. 180).

33.     Mr. Moran's analysis of the Debtors' 2017 tax return revealed that over eight months in 2017, Debra Ravasia's gross average income was $32,558 per month, and her net average income was $15,474 per month. (Ex. 9, p.2).

FINDINGS OF FACT, CONCLUSIONS OF LAW & ORDER - 13

34.     In 2017, Debtors reported on their joint tax return Form 1040 combined gross income from wages, salaries and tips of $648,181. (Ex. 103).

35.     Mr. Moran's analysis of the Debtors' bank deposit information revealed total 2017 deposits of $967,127.31, and that after deductions, the Debtors' average 2017 bank deposits was $69,204.86 per month. (Ex. 9, p. 2).

36.     Mr. Moran testified that if the United States Trustee was informed of Debra Ravasia's actual income at the time debtors completed their schedules or amended schedules, the United States Trustee's office would have conducted additional inquiry in the case.

37.     The Debtors' Schedule I, filed on January 19, 2017, that indicated Debra Ravasia's income as $0 was not materially false because, at that time, she did not have regular income and she was looking for work.

38.     To the extent Debra Ravasia testified that she was not employable and her income was always uncertain, the court finds her testimony not credible.

39.     The Debtors' May 28, 2019, Amended Schedule I that continued to list Debra Ravasia's income as $0 was materially false because as early as May, 2017, Debra Ravasia had substantial monthly earnings. Debra Ravasia may have been looking for work in January, 2017, but as early as May, 2017, she had found it.

40.     The fact that Debra Ravasia's reported income of $0 per month on Amended Schedule I was false was evident to the Ravasias. The United States

Trustee established by a preponderance of the evidence that this false oath was made knowingly, deliberately and consciously. The Debtors acted with intent to deceive interested parties about the income earned by Debra Ravasia.

**ON-GOING EXPENSES**

41.     Chapter 7 Debtors must also estimate on-going expenses on Schedule J, Part 2. On this form, Debtors entered dollar amounts for categories of expenses including real estate taxes, home maintenance, utilities, food, housekeeping, children's education, clothing, personal products, medical expenses, car payments, entertainment, and insurance. The Debtors' estimated expenses totaled $26,805.06 per month. The Debtors' expenses were greater than their reported income by $15,317.97 per month. (ECF No. 1-3, pp. 43-45).

42.     Chapter 7 Trustee John Munding testified that the Debtors' "lifestyle numbers did not equal what their lifestyle cost." Additionally, he testified that the Debtors continued to use and pay credit cards that were not listed on Schedule J, and to pay other expenses that were not listed or disclosed.

43.     During the April 26, 2019, Section 341 Meeting of Creditors, Sajid Ravasia acknowledged that the expenses listed in Schedule J was an underestimation. (Ex. 27, pp.71-72). Debra Ravasia, at the same hearing, stated that the expenses listed on Schedule J were never intended to be a forecast of anticipated living expenses:

FINDINGS OF FACT, CONCLUSIONS OF LAW & ORDER - 15

DEBRA RAVASIA: …at the time we filed in that moment, that was what our expenses were. We understood that if it had been a Chapter 11 making a predictive projective [sic] what will this be was [sic]…was needed. This was not intended as a projection. This was intended as [an] in this moment on the day we filed the Chapter 7 what are our expenses on this day. We had no idea what would…what to expect going forward. This is what they were on that day.

JIM PERKINS: Are you suggesting that you don't think the Schedule J here at part of Ex. 6 is an accurate forecast of your expected living expenses?

DEBRA RAVASIA: It wasn't built as a forecast. It was built as a…as best we know what our expenses are at this moment at the time of filing a Chapter 7 this is as much as we knew about what our expenses were at that moment. We knew nothing about what they would be going forward. There were so many things to adjust, and it was very complicated.

(Ex. 27, pp. 72-73).

44.     Sajid Ravasia admitted at trial that schedule J did not accurately reflect the household expenses at the time of filing or expenses anticipated for the next year. He testified that the Debtors did not know what to expect, but they did expect that they would spend substantially more than they represented on schedule J.

45.     At trial, the United States Trustee introduced evidence that in 2017 the Ravasias received a combined net income of approximately $550,000 and they spent substantially all of this income, or an average of $45,000 per month, as compared to the $26,000 Debtors reported as monthly expenses in Schedule J.

46.     The Ravasias' misrepresentation of their ongoing household expenses is a material misrepresentation.

47.     The Debtors acknowledged that their estimate of on-going household expenses reported on their schedules was inaccurate. The United States Trustee established by a preponderance of the evidence that the Ravasias' misrepresentations about their monthly expenses was a material fact, made knowingly, deliberately and consciously.

**REMAINING FALSE OATHS, CONCEALMENT**

48.     The United States Trustee also alleged that the Ravasias made additional false oaths on their Schedules related to the amount of their unsecured debt, their 2016 income tax refund, and their conduct related to a ski condominium that they sold to Debra Ravasia's father. The court does not need to address these additional allegations in light of the court's findings of fact and conclusions of law regarding the Ravasias' false oaths related to income and expenses.

## IV.  CONCLUSIONS OF LAW

1.     The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§157 and 1334.

2.     This is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(J).

3.     Pursuant to Section 727(c)(1) of the Bankruptcy Code, the United States Trustee has standing to bring this action.

4.     Under Federal Civil Rule of Procedure 15(b)(2), "[w]hen an issue not raised by the pleadings is tried by the parties' express or implied

consent, it must be treated in all respects as if raised in the pleading."

Additionally, "[a] party who knowingly acquiesces in the introduction of

evidence relating to issues that are beyond the pleadings is in no position to

contest a motion to conform." 6A Charles Alan Wright & Arthur R. Miller,

Federal Practice and Procedure § 1493 (3d ed. 1998).

5.     Because the Debtors did not object to the introduction of

evidence related to the anticipated 2016 tax refund, the Complaint is deemed

amended to include the Ravasias' representations about the 2016 tax refund

as a basis for a false oath.

6.     The general policy of bankruptcy law favors allowing an honest

debtor to discharge debts and to make a fresh start free from the burden of

past indebtedness. *See Lines v. Frederick,* 400 U.S. 18, 19 (1970*).* Because a

debtor in bankruptcy is assumed to be poor but honest, a presumption exists

that all debts are dischargeable unless a party who contends otherwise

proves, with competent evidence, an exception to discharge. See *Brown v.*

*Felsen*, 442 U.S. 127, 128-29 (1979). Only the "honest but unfortunate"

debtor is entitled to an entirely unencumbered fresh start. *Marrama*, 549

U.S. at 374; *Grogan*, 498 U.S. at 286-87; *In re Apte,* 96 F.3d 1319, 1322

(9th Cir. 1996)(dishonest debtor will not benefit from his wrongdoing). The

FINDINGS OF FACT, CONCLUSIONS OF LAW & ORDER - 18

opportunity to obtain a fresh start "is conditioned upon truthful disclosure." *In re Wills,* 243 B.R. 58, 63 (B.A.P. 9th Cir. 1999).

7.     When determining the credibility of witnesses, the bankruptcy court, as the trier of fact, has the opportunity to note "variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." *Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985).

## FALSE OATH

8.     The court shall grant a debtor a discharge unless an exception listed in 11 U.S.C. §727(a) applies. One exception that prevents discharge is where a debtor "knowingly and fraudulently, in or in connection with the case … made a false oath or account." 11 U.S.C. §727(a)(4)(A).

9.     The primary purpose of the "false oath" discharge exception is to ensure that dependable information is supplied for those who are interested in administration of a bankruptcy estate without the need for trustee or other interested parties to dig out the true facts in examinations or investigations. *In re Pansier*, 613 B.R. 119, 159 (Bankr. E.D. Wis. 2020).

10.     "Every debtor has a continuing duty to assure the accuracy and completeness of schedules. Postpetition discovery of rights that actually existed at the time of filing must be addressed in the schedules. This implies

a duty to amend." *In re Searles*, 317 B.R. 368, 378 (B.A.P. 9th Cir. 2004), aff'd, 212 F. App'x 589 (9th Cir. 2006). "The continuing nature of the duty to assure accurate schedules of assets is fundamental because the viability of the system of voluntary bankruptcy depends upon full, candid, and complete disclosure by debtors of their financial affairs." *Id.*

11.     "Generally, a debtor who acts in reliance on the advice of his attorney lacks the intent required to deny him a discharge of his debts." *In re Adeeb*, 787 F.2d 1339, 1343 (9th Cir. 1986). "However, the debtor's reliance must be in good faith." *Id.* "The advice of counsel is not a defense when the erroneous information should have been evident to the debtor." *In re Retz,* 606 F.3d 1189, 1199 (9th Cir. 2010). "A debtor cannot, merely by playing ostrich and burying his head deeply enough in the sand, disclaim all responsibility for statements which he has made under oath." *Id. (quoting Boroff v. Tully*, 818 F.2d 106, 111 (1st Cir.1987)*.

12.     Courts construe Section 727 liberally in favor of debtors and strictly against parties objecting to discharge. *Bernard v. Sheaffer*, 96 F.3d 1279, 1281 (9th Cir.1996). This means that "actual, rather than constructive, intent is required" on the part of the debtor. *In re Khalil*, 379 B.R. 163, 172 (B.A.P. 9th Cir. 2007), aff'd, 578 F.3d 1167 (9th Cir. 2009).

13.     To prevail on a Section 727(a)(4)(A) claim, a plaintiff must establish, by a preponderance of the evidence, four elements: (1) the debtor made a false oath in connection with the case; (2) the false oath related to a material fact; (3) the false oath was made knowingly; and (4) the false oath was made fraudulently. *In re Retz,* 606 F.3d at 1197; *Roberts v. Erhard*, 331 B.R. 876, 882 (9th Cir. BAP 2005).

14.     "A false statement or an omission in the debtor's bankruptcy schedules or statement of financial affairs can constitute a false oath." *In re Roberts*, 331 B.R. at 882; *see also In re Searles*, 317 B.R. at 377. False statements about a debtor's income and expenses constitute a "false oath." *In re Khalil*, 379 B.R. at 172(income); *In re Turner*, 335 B.R. 140, 148-49 (Bankr. N.D. Cal 2005)(expenses).

15.     The second element necessary to establish a Section 727(a)(4)(A) claim requires that the false oath relate to a material fact. *In re Roberts*, 331 B.R. at 882. "A fact is material 'if it bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property.'" *In re Khalil*, 379 B.R. at 173 (*quoting In re Wills*, 243 B.R. at 62). An omission or misstatement that "detrimentally affects administration of the

estate" is deemed material. *In re Wills*, 243 B.R. at 63 (citing 6 Lawrence P. King et al., COLLIER ON BANKRUPTCY ¶ 727.04(1)(b) (15th ed. rev.1998)).

16.    The third element in establishing a Section 727(a)(4)(A) claim is that the debtor makes the false oath knowingly. A debtor acts knowingly when the debtor "acts deliberately and consciously." *Roberts*, 331 B.R. at 883; *Retz,* 606 F.3d at 1198 (debtor's signing of schedules when he knew the information was incomplete was enough to support finding that debtor acted knowingly).

17.    The fourth and final element that an objecting party must establish in a Section 727(a)(4)(A) claim is that debtor's false oath was made fraudulently. Intent is usually proven by circumstantial evidence or by inferences drawn from the debtor's conduct. *Retz,* 606 F.3d at 1198-99*; Devers v. Bank of Sheridan, Mont.*, 759 F.2d 751, 753–54 (9th Cir.1985); *see also In re Roberts*, 331 B.R. at 884.

18.    Reckless indifference or disregard for the truth may be circumstantial evidence of intent, but is not sufficient, alone, to constitute fraudulent intent. *Retz,* 606 F.3d at 1199; *In re Khalil,* 379 B.R. at 173-75.

19.    "The existence of more than one falsehood, together with a debtor's failure to take advantage of the opportunity to clear up all inconsistencies and omissions, such as when filing amended schedules, can

be found to constitute reckless indifference to the truth satisfying the requisite finding of intent to deceive." *In re Khalil,* 379 B.R. at 175 (a significant number of falsehoods and omissions, together with the failure to amend the Schedules and Statement of Financial Affairs in the three years between the petition and trial, can constitute reckless indifference to the truth, which is evidence of fraudulent intent); *see also Martin Marietta Materials SW., Inc. v. Lee,* 309 B.R. 468, 477 (Bankr.W.D.Tex.2004)(the existence of more than one falsehood, together with a debtor's failure to take advantage of the opportunity to clear up all inconsistencies and omissions, such as when filing amended schedules, can be deemed reckless indifference to the truth satisfying the requisite finding of intent to deceive); *In re Topping,* 84 B.R. 840 (Bankr. M.D. Fla. 1988)(where assets of substantial value were omitted from debtor's schedules, conclusion was warranted that omission was purposeful, with fraudulent intent to conceal assets).

20.    The United States Trustee established by a preponderance of the evidence all the elements necessary to establish Debtors made false oaths on their schedules related to Sajid Ravasia's income. During the month the Debtors filed their petition, January 2017, Sajid Ravasia earned less income than was typical because he took vacation days and did not see extra patients as he routinely did during other periods. In other words, the month of

January, 2017 was not a representative month for his income and the use of that single month, without consideration of his substantial annual bonus and his average income from most months, was fraudulent. The Ravasias' failure to amend the schedules with accurate information, after Sajid Ravasia's bonus was received in July, 2017, is sufficient evidence to establish the false oath was made fraudulently. The fact that Sajid Ravasia's income on Schedule I was misrepresented was evident to the Ravasias, and thus the false oath was made knowingly and fraudulently. The Ravasias additional failure to indicate on Schedule I, line 13 that Sajid Ravasia's income could increase, when the Ravasias knew that Sajid typically was paid a substantial "bonus" in July each year, is additional support for the finding of a material false oath, made knowingly and with the intent to deceive.

21. The Debtors' material misrepresentations of Sajid Ravasia's income in the 2019 Amended Schedules were made knowingly and fraudulently with an intent to deceive.

22. The United States Trustee also established by a preponderance of the evidence that Debtors knowingly and fraudulently made false oaths related to Debra Ravasia's reported income. By May of 2017, Debra Ravasia began to earn regular income, but the Ravasias failed to amend their Schedules and they failed to disclose her substantial income in the 2019

Amended Schedule I. The Ravasias' failure to amend the schedules with accurate information, after Debra began to earn regular income is sufficient evidence to establish the false oath was made fraudulently. The fact that Debra Ravasia's income on Schedule I was entirely omitted was evident to the Ravasias, and thus the false oath was made knowingly and fraudulently.

23. Because the advice of counsel is not a defense when the erroneous information should have been, and admittedly was, evident to the Debtors by July, 2017, and in light of the continuing nature of the duty to provide accurate schedules, the Debtors' false oaths related to both Debtors' income were made knowingly and fraudulently.

24. Additionally, the United States Trustee established by a preponderance of the evidence that the Debtors made a false oath by mispresenting their expected ongoing expenses. The Ravasias both acknowledged that the report of their expenses was inaccurate. The Ravasias knowingly provided false information and failed to amend their schedules with accurate information. This financial information is material and, under these circumstances, the failure to provide accurate information was knowing and fraudulent.

25. 11 U.S.C. § 706(b) permits a Bankruptcy Court to convert a Chapter 7 case to Chapter 11 over objection from the debtor when

conversion furthers the goals of the Bankruptcy Code. *In re Parvin*, 549 B.R. 268, 271 (W.D. Wash. 2016). Factors the court considers include the debtor's ability to repay debt, whether the case is likely to immediately reconvert, and whether parties in interest would benefit from conversion. *Decker v. Office of the United States Tr.*, 548 B.R. 813, 817 (D. Alaska 2015).

26.    In what might have been an attempt to prevent the Chapter 7 Trustee or the United States Trustee from moving to convert this case to a Chapter 11, the Ravasias adopted a zealous position regarding their financial reporting. However, their zealous actions amounted to fraud because, as discussed above, they intentionally made material misrepresentations about their income and expenses. These misrepresentations support the conclusion that the Ravasias are not entitled to a chapter 7 discharge. Nevertheless, in a subsequent chapter 11 proceeding, the Ravasias could possibly obtain debt relief after consummating a plan of reorganization that provides for the distribution of a portion of their income to their creditors.

## V.  **ORDER**

Based on the foregoing findings of fact and conclusions of law,

**IT IS ORDERED:**

1.   The United States Trustee's Rule 7015(b)(2) Motion to amend the pleadings to conform to the evidence (Adversary Case No. 17-80021, ECF No. 171) is **GRANTED**; and

2.   The Ravasias' Chapter 7 discharge of debts is **DENIED.**

///END OF ORDER///